Dear Mr. Perez:
On behalf of David W. Hood, Secretary of the Louisiana Department of Health and Hospitals, you requested our legal opinion on the question whether the recent approval of RU-486 (Mifepristone) by the U.S. Food and Drug Administration (FDA) creates a conflict between La.R.S. 46:153.3 and La.R.S. 40:1299.34.5. In our opinion, whatever conflict exists in this situation is merely an apparent one, and the question is resolved by adherence to La.R.S. 40:1299.34.5 as the law specifically applicable to Medicaid funding of abortions.
La.R.S. 46:153.3 is found under the headings and subheadings of "Public Assistance," "Adult Services," and "Elderly, Blind and Disabled." The pertinent part of the statute itself, quoted with surrounding context revealing its overall legislative purpose, reads as follows:
 "§ 153.3. Medical vendor reimbursements; allowable restrictions; peer-based prescribing and dispensing practice patterns; Medicaid Drug Program Committee
 "A. The Louisiana Legislature recognizes the need to ensure that the state delivers a medical assistance program which is cost effective and prudently administered. The legislature acknowledges that rising health care costs are creating an increased demand on the state's limited revenues. Further, the legislature finds that cost effective programs such as the medical assistance drug program optimize existing fiscal resources while improving the quality of patient care and reducing the need for more expensive health care services.
 "B. (1) The department may limit reimbursement for multi-source prescription drugs in accordance with state and federal law, except as provided in R.S. 46:153.3(B)(2).
 "(2) The department shall provide reimbursement for any drug prescribed by a physician that, in his professional judgment and within the lawful scope of his practice, he considers appropriate for the diagnosis and treatment of the patient.
 "(3) The department shall not establish a drug formulary that, except as otherwise provided in Subparagraph (4)(a), restricts by any prior or retroactive approval process a physician's ability to treat a patient with a prescription drug that has been approved and designated as safe and effective by the Food and Drug Administration. Drugs for cosmetic purposes and nonprescription drugs, anorexic drugs, drugs used solely for the treatment of infertility when prescribed for that purpose, cough and cold preparations, and minor tranquilizers are exempt from the provisions of this Paragraph. However, the department may include these categories for reimbursement based upon recommendations from the Medicaid Drug Program Committee.
 * * * "
 [Acts 1989, No. 403,§ 1, eff. June 30, 1989; Acts 1995, No. 991,§ 1; Acts 1999, No. 795,§ 1; Acts 1999, No. 802,§ 7, eff. July 2, 1999; Acts 1999, No. 1245,§ 1.]
As you explained in your letter, the pertinent part of the statute that you are concerned about is La.R.S. 46:153.3(B)(3), supra, which you refer to as the "open formulary law." You further relate that this provision requires Medicaid generally to pay for any FDA-approved drug for which the drug company signs a rebate agreement with the federal government and explain that Medicaid pays for prescription drugs in Louisiana through the Louisiana Medicaid Prescription Drug Services Program, which provides pharmacy benefit management services to Medicaid-enrolled pharmacies. In contrast, as you noted in your opinion request letter, RU-486 (Mifepristone) will not be available to the public through pharmacies, even by prescription, because the FDA-approval of this drug is restricted (through the FDA-approved labeling requirements) to its being administered individually to a patient only in a clinic, medical office, or hospital and then only by or under the supervision of a physician who meets certain criteria. A copy of the substance of the FDA letter of approval and label (obtained from the FDA website) is enclosed with this opinion for your convenience.
The only purpose for which RU-486 (Mifepristone) [MIFEPREX] is approved by the FDA is as an abortifacient for early pregnancies (through 49 days of pregnancy). Because its only purpose is to effect abortions, it is governed, for Medicaid funding purposes, by the federal Hyde Amendment[1] and La.R.S. 40:1299.34.5, which was last amended to comply with the current Hyde Amendment and Hope Medical Group for Women, etc., et al. v. Edwards, etc.,et al., 63 F.3d 418 (U.S. App. 5th Cir. 1995). "Title XIX does not require a participating State to include in its plan any services for which a subsequent Congress has withheld federal funding," Harris v. McRae, 448 U.S. 297, 309, 100 S.Ct. 2671,2684, 65 L.Ed.2d 784 (1980) [as quoted and cited in Hope MedicalGroup for Women, supra, 63 F.3d at 424].[2]
It is a well-settled rule of statutory construction in Louisiana that where two statutes deal with the same subject matter, they should be harmonized if possible; however, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character.LeBreton v. Rabito, et al., 97-2221 (La. 7/8/98), 714 So.2d 1226
[citing State ex rel. Bickman v. Dees, 367 So.2d 283 (La. 1978) andEsteve v. Allstate Ins. Co., 351 So.2d 117 (La. 1977)].
In this situation, La.R.S. 40:1299.34.5 is specifically directed at the matter of Medicaid funding for abortions and controls over the more general Medicaid-related statutes dealing with the broader categories of "medical services" as a whole and "prescription drugs" as a whole (including La.R.S. 46:153.3,supra). Thus, we agree with your conclusion that La.R.S.40:1299.34.5 governs the payment for abortion procedures regardless of whether the physician performs a surgical abortion or provides a patient with RU-486 (Mifepristone). Both methods cause the deliberate termination of a human pregnancy with the intention other than to produce a live birth, remove an ectopic pregnancy, or to remove a dead unborn child caused by spontaneous abortion, missed abortion, or inevitable abortion (the statutory definition of abortion contained in La.R.S. 40:1299.35.1).
R.S. 40:1299.34.5, the governing statute, reads as follows:
 "§ 1299.34.5. Use of public funds
 "A. Notwithstanding any other provision of law to the contrary, no public funds, made available to any institution, board, commission, department, agency, official, or employee of the state of Louisiana, or of any local political subdivision thereof, whether such funds are made available by the government of the United States, the state of Louisiana, or of a local governmental subdivision, or from any other public source shall be used in any way for, to assist in, or to provide facilities for an abortion, except when the abortion is medically necessary to prevent the death of the mother.
 "B. Notwithstanding any other provision of law to the contrary, no public funds made available to any institution, board, commission, department, agency, official, or employee of the state of Louisiana, or of any local political subdivision thereof, whether such funds are made available by the government of the United States, the state of Louisiana, or a local governmental subdivision, or from any other public source, shall be used in any way for, to assist in, or to provide facilities for an abortion, except for any of the following:
 "(1) Whenever the abortion is necessary to save the life of the mother.
 "(2) Whenever the abortion is being sought to terminate a pregnancy resulting from an alleged act of rape and all of the requirements of R.S. 40:1299.35.7(A)[3] are met.
 "(3) Whenever the abortion is being sought to terminate a pregnancy resulting from an alleged act of incest and all of the requirements of R.S. 40:1299.35.7(B)[4] are met.
 "C. The secretary of the Department of Health and Hospitals shall promulgate rules to insure that no funding of any abortion shall be made based upon a claim of rape or incest until the applicable requirements of R.S. 40:1299.35.7 have been complied with and written verification has been obtained from the physician performing the abortion and from the law enforcement official to whom the report is made, if applicable.
 "D. Subsection A of this Section shall be superseded and Subsections B and C and R.S. 40:1299.35.7 shall become effective only when the circumstances in Subparagraph (1)(a) or in Subparagraph (2)(a) occur:
 "(1) (a) A decision or order of a court of competent jurisdiction is rendered declaring the provisions of Subsection A unconstitutional, inconsistent with federal law, or otherwise unenforceable based on inconsistency with the Hyde Amendment, or enjoins the state or any of its officials from enforcing Subsection A while at the same time accepting federal funds pursuant to Title XIX, as modified by the Hyde Amendment, and then only if, as, and when a stay pending all appeals of the decision or order is denied, or, if a stay is granted, such stay expires or is no longer effective.
 "(b) If such a decision or order is rendered, the state Department of Justice, on behalf of the state, shall vigorously and expeditiously pursue judicial remedies seeking to obtain a stay pending all appeals of the decision or order and its reversal.
 "(2) (a) An order or decision of a court of competent jurisdiction is rendered affirming a finding of the administrator of the Health Care Financing Administration of the United States Department of Health and Human Services that Subsection A fails to substantially comply with the Hyde Amendment or denying a stay of the finding of the administrator and then only if, as, and when the state receives formal notification from the administrator that Medicaid funds, including but not limited to the federal percentage of Medicaid assistance payments pursuant to 42 U.S.C. § 1396 et seq. allocated to the state from the United States government, will be withheld or terminated on a specified date.
 "(b) If the administrator finds that the state is in noncompliance with the Hyde Amendment as it relates to funding certain abortions, the governor, the state Department of Justice, and the state Department of Health and Hospitals, on behalf of the state, shall vigorously and expeditiously pursue administrative and judicial remedies to obtain a stay of the finding and its reversal.
 "(c) If such a decision or order is rendered by a court, the state Department of Justice, on behalf of the state, shall vigorously and expeditiously pursue judicial remedies seeking to obtain a stay of the decision or order and to seek its reversal.
 "E. If Subsections B and C and R.S. 40:1299.35.7 become effective and subsequently the federal requirement for acceptance of Medicaid funds, that public funds be made available for abortions resulting from pregnancy due to rape or incest, is no longer applicable to the state of Louisiana, then on the same day, the provisions of Subsections B and C and R.S. 40:1299.35.7 shall be superseded and the provisions of Subsection A shall be effective to the fullest extent allowed by law."
As a legal matter, the current circumstances at this time are such that the criteria specified in Subsection D of the above quoted statute cause Subsections B and C thereof to supersede Subsection A of the statute. As indicated in footnote 1, supra, the Hyde Amendment appears to continue to provide for the rape and incest exceptions, and the Hope Medical Group case, supra, has effected a definitive federal court judgment that under the current federal Medicaid statutes and regulations, Louisiana must provide a rape and incest exception in addition to its life-preservation exception.
Consequently, administration of RU-486 by a qualified physician in compliance with the FDA requirements in the circumstances described by the rape, incest, and life-preservation exceptions contained in § 1299.34.5(B)(1), (2), and (3), above, would appear to us to fall into the same category as a surgical abortion done in those same circumstances and would qualify for public Medicaid funding if all the other conditions therefore were otherwise fulfilled. However, in our opinion, administration of this drug under any other circumstance would not qualify for Medicaid reimbursement under currently prevailing law.
Trusting this opinion has sufficiently answered your inquiry, we remain
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 By: ____________________________ THOMAS S. HALLIGAN Assistant Attorney General
Encl.
[1] The current Hyde Amendment's prohibition against the use of federal funds for abortions except to save the life of the mother or in cases of rape or incest, appears to have remained unchanged since the Hope Medical Group for Women case. See, for example, P.L. 106-113 (Appendix "D," HR 3424, Secs. 508-509).
[2] Even if RU-486 had been FDA-approved for some other purpose as well, the La.R.S. 40:1299.34.5 Medicaid funding provision would be applicable to the occasions when its actual use was to effect an abortion, as defined in R.S. 40:1299.35.1. Indeed, inasmuch as otherwise appropriate to the particular factual circumstances, each one of Louisiana's abortion laws applies to such use of RU-486.
[3] R.S. 40:1299.35.7(A) refers to certain rape reporting requirements.
[4] R.S. 40:1299.35.7(B)refers to certain incest reporting requirements.
 NDA 20-687
September 28, 2000
Population Council Attention: Sandra P. Arnold Vice President, Corporate Affairs 1230 York Avenue New York, N Y 10021
Dear Ms. Arnold:
Please refer to your new drug application (NDA) dated March 14, 1996, received March 18, 1996, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for MIFEPREXTM (mifepristone) Tablets, 200 mg.
We acknowledge receipt of your submissions dated April 19, June 20, July 25, August 15 and September 16 and 26, 1996; January 30, March 31, July 28, August 5, September 24, November 26, 1997; January 30(2), February 19, April 27, June 25, October 26, December 8, 1998; February 8 and 22, March 31, April 28, May 10 and 20, June 3(2), 15, 23, 25, and 30, July 14(2) and 22, August 3, 13, 18 and 30, September 3, 8, 13 and 30, October 5, 26 and 28, November 16 and 29 (2), December 6, 7 and 23, 1999; and January 11, 21 and 28(2), February 16 and 24, March 3, 6, 9, 10, 30 and 31(2), April 20, May 3, 11 and 17, June 22 and 23, July 11, 13, 25 and 27, August 18, 21 and 24, September 8, 12, 15 (2), 19(2), 20, 21, 22, 26 (2), and 27(2), 2000. Your submission of March 30, 2000 constituted a complete response to our February 18, 2000 action letter.
This new drug application provides for the use of MifeprexTM for the medical termination of intrauterine pregnancy through 49 days' pregnancy.
We have completed the review of this application, as amended, and have concluded that adequate information has been presented to approve MifeprexTM (mifepristone) Tablets, 200 mg, for use as recommended in the agreed upon labeling text. The application is approved under 21 C.F.R. § 314 Subpart H. Approval is effective on the date of this letter. Marketing of this drug product and related activities are to be in accordance with the substance and procedures of the referenced regulations.
The final printed labeling (FPL) [including the professional labeling (Package Insert), the Medication Guide required for this product under21 C.F.R. Part 208, the Patient Agreement Form, and the Prescriber's Agreement Form] must be identical to the submitted draft labeling (Package insert, Medication Guide, Patient Agreement Form, and the Prescriber's Agreement Form submitted September 27, 2000; and the immediate container and carton labels submitted July 25, 2000). Marketing the product with FPL that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug.
Please submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Please individually mount ten of the copies on heavy-weight paper or similar material. Alternatively, you may submit the FPL electronically according to the guidance for industry titled Providing Regulatory Submissions inElectronic Format — NDAs (January 1999). For administrative purposes, this submission should be designated "FPL for approved NDA 20-687." Approval of this submission by FDA is not required before the labeling is used.
Under 21 C.F.R. § 314.520, distribution of the drug is restricted as follows:
 MifeprexTM must be provided by or under the supervision of a physician who meets the following qualifications:
 • Ability to assess the duration of pregnancy accurately.
 • Ability to diagnose ectopic pregnancies.
 • Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through other qualified physicians, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.
 • Has read and understood the prescribing information of MifeprexTM.
 • Must provide each patient with a Medication Guide and must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and Patient Agreement, give her an opportunity to read and discuss both the Medication Guide and the Patient Agreement, obtain her signature on the Patient Agreement and must sign it as well.
 • Must notify the sponsor or its designate in writing as discussed in the Package Insert under the heading DOSAGE AND ADMINISTRATION in the event of an ongoing pregnancy, which is not terminated subsequent to the conclusion of the treatment procedure.
 • Must report any hospitalization, transfusion or other serious events to the sponsor or its designate.
 • Must record the MifeprexTM package serial number in each patient's record.
 With respect to the aspects of distribution other than physician qualifications described above, the following applies:
 • Distribution will be in accordance with the system described in the March 30, 2000 submission. This plan assures the physical security of the drug product and provides specific requirements imposed by and on the distributor including procedures for storage, dosage tracking, damaged product returns, and other matters.
We also note the following Phase 4 commitments, specified in your submission dated September 15, 2000. These commitments replace all previous commitments cited in the September 18, 1996 and the February 18, 2000 approvable letters. These Phase 4 commitments are:
1. A cohort-based study of safety outcomes of patients having medical abortion under the care of physicians with surgical intervention skills compared to physicians who refer their patients for surgical intervention. Previous study questions related to age, smoking, and follow-up on day 14 (compliance with return visit) will be incorporated into this cohort study, as well as an audit of signed Patient Agreement forms.
2. A surveillance study on outcomes of ongoing pregnancies.
You have agreed to provide the final Phase 4 protocols for these studies within six months.
Protocols, data, and final reports should be submitted to your IND for this product and a copy of the cover letter sent to this NDA. If an IND is not required to meet your Phase 4 commitments, please submit protocols, data and final reports to this NDA as correspondence. In addition, under 21 C.F.R. § 314.81(b)(2)(vii), we request that you include a status summary of each commitment in your annual report to this NDA. The status summary should include the number of patients entered in each study, expected completion and submission dates, and any changes in plans since the last annual report. For administrative purposes, all submissions, including labeling supplements, relating to these Phase 4 commitments must be clearly designated "Phase 4 Commitments."
We also remind you that, under 21 C.F.R. § 314.550, after the initial 120 day period following this approval, you must submit all promotional materials, including promotional labeling as well as advertisements, at least 30 days prior to the intended time of initial dissemination of the labeling or initial publication of the advertisement.
Be advised that, as of April 1, 1999, all applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred (63 FR 66632). We are waiving the pediatric study requirement for this action on this application.
Please submit one market package of the drug product when it is available.
We remind you that you must comply with the requirements for an approved NDA set forth under 21 C.F.R. § 314.80 and 314.81. ____________________________ If you have any questions, call [____________________________]
Sincerely,
Center for Drug Evaluation and Research
APPEARS THIS WAY ON ORIGINAL
MIFEPREXTM (mifepristone) Tablets, 200 mg For Oral Administration Only
If Mifeprex* results in incomplete abortion, surgical intervention may be necessary. Prescribers should determine in advance whether they will provide such care themselves or through other providers. Prescribers should also give patients clear instructions on whom to call and what to do in the event of an emergency following administration of Mifeprex.
Prescribers should make sure that patients receive and have an opportunity to discuss the Medication Guide and the PATIENT AGREEMENT.
DESCRIPTION
Mifeprex tablets each contain 200 mg of mifepristone, a synthetic steroid with antiprogestational effects. The tablets are light yellow in color, cylindrical and biconvex, and are intended for oral administration only. The tablets include the inactive ingredients colloidal silica anhydrous, corn starch, povidone, microcrystalline cellulose, and magnesium stearate.
Mifepristone is a substituted 19-nor steroid compound chemically designated as 11ß-[p-(Dimethylamino)phenyl]-17ß-hydroxy-17- (1-propynyl)estra-4,9-dien-3-one. Its empirical formula is C29H35NO2. Its structural formula is:
The compound is a yellow powder with a molecular weight of 429.6 and a melting point of 191-196°C. It is very soluble in methanol, chloroform and acetone and poorly soluble in water, hexane and isopropyl ether.
* Mifeprex is a trademark of Danco Laboratories, LLC.
CLINICAL PHARMACOLOGY
Pharmacodynamic Activity
The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit and monkey), the compound inhibits the activity of endogenous or exogenous progesterone. The termination of pregnancy results.
Doses of 1 mg/kg or greater of mifepristone have been shown to antagonize the endometrial and myometrial effects of progesterone in women. During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity of prostaglandins.
Mifepristone also exhibits antiglucocorticoid and weak antiandrogenic activity. The activity of the glucocorticoid dexamethasone in rats was inhibited following doses of 10 to 25 mg/kg of mifepristone. Doses of 4.5 mg/kg or greater in human beings resulted in a compensatory elevation of adrenocorticotropic hormone (ACTH) and cortisol. Antiandrogenic activity was observed in rats following repeated administration of doses from 10 to 100 mg/kg.
Pharmacokinetics and Metabolism
Absorption
Following oral administration of a single dose of 600 mg, mifepristone is rapidly absorbed, with a peak plasma concentration of 1.98 mg/l occurring approximately 90 minutes after ingestion. The absolute bioavailability of a 20 mg oral dose is 69%.
Distribution
Mifepristone is 98% bound to plasma proteins, albumin and 1-acid glycoprotein. Binding to the latter protein is saturable, and the drug displays nonlinear kinetics with respect to plasma concentration and clearance. Following a distribution phase, elimination of mifepristone is slow at first (50% eliminated between 12 and 72 hours) and then becomes more rapid with a terminal elimination half-life of 18 hours.
Metabolism
Metabolism of mifepristone is primarily via pathways involving N-demethylation and terminal hydroxylation of the 17-propynyl chain. Invitro studies have shown that CYP45O 3A4 is primarily responsible for the metabolism. The three major metabolites identified in humans are: (1) RU 42 633, the most widely found in plasma, is the N-monodemethylated metabolite; (2) RU 42 848, which results from the loss of two methyl groups from the 4-dimethylaminophenyl in position 11ß; and (3) RU 42 698, which results from terminal hydroxylation of the 17-propynyl chain.
Excretion
By 11 days after a 600 mg dose of tritiated compound, 83% of the drug has been accounted for by the feces and 9% by the urine. Serum levels are undetectable by 11 days.
Special Populations
The effects of age, hepatic disease and renal disease on the safety, efficacy and pharmacokinetics of mifepristone have not been investigated.
Clinical Studies
Safety and efficacy data from the U.S. clinical trials and from two French trials of mifepristone are reported below. The U.S. trials provide safety data on 859 women and efficacy data on 827 women with gestation durations of 49 days or less (dated from the first day of the last menstrual period). In the two French clinical trials, safety evaluable data are available for 1800 women, while efficacy information is available for 1681 of these women. Success was defined as the complete expulsion of the products of conception without the need for surgical intervention. The overall rates of success and failure, shown by reason for failure, for the U.S. and French studies appear in Table 1.
In the U.S. trials, 92.1% of the 827 subjects had a complete medical abortion, as shown in Table 1. In 52 women (6.3%) expulsion occurred within two days, and resulted from the action of mifepristone (600 mg) alone, unaided by misoprostol, an analog of prostaglandin E2. All other women without an apparent expulsion took a 400 µg dose of misoprostol two days after taking mifepristone. Many women (44.1%) in the U.S. trials expelled the products of conception within four hours after taking misoprostol and 62.8% experienced expulsion within 24 hours after the misoprostol administration. There were 65 women (7.9%) who received surgical interventions: 13 (1.6%) were medically indicated interventions during the study period, mostly for excessive bleeding; five (0.6%) interventions occurred at the patient's request; 39 women (4.7%) had incomplete abortions at the end of the study protocol; and eight (1.0%) had ongoing pregnancies at the end of the study protocol.
Women who participated in the U.S. trials reflect the racial and ethnic composition of American women. The majority of women (71.4%) were Caucasian, while 11.3% were African American, 10.9% were East Asian, and 4.7% were Hispanic. A small percentage (1.7%) belonged to other racial or ethnic groups. Women aged 18 to 45 were enrolled in the trials. Nearly two-thirds (66.0%) of the women were under 30 years old with a mean age of 27 years.
In the French trials, complete medical abortion occurred in 95.5% of the 1681 subjects, as shown in Table 1. In 89 women (5.3%), complete abortion occurred within two days of taking mifepristone (600 mg). About half of the women (50.3%) in the French trials expelled the products of conception during the first four hours immediately following administration of misoprostol and 72.3% experienced expulsion within 24 hours after taking misoprostol. In total, 4.5% of women in the French trials ultimately received surgical intervention for excessive bleeding, incomplete abortions, or ongoing pregnancies at the end of the protocol.
 Table 1 Outcome FollowingTreatment with Mifepristone and Misoprostol in the US. and French Trials U.S. Trials French Trials
 N % N %
Complete medical abortion 762 92.1 1605 95.5
Timing of expulsion
Before second visit 52 (6.3) 89 (5.3)
 During second visit — less than 4 hrs after misoprostol 365 (44.1) 846 (50.3)
 After second visit — greater than 4 hrs but less than 24 hrs after misoprostol 155 (18.7) 370 (22.0)
— greater than 24 hrs after misoprostol 68 (8.2) 145 (8.6)
Time of expulsion unknown 122 (14.8) 155 (9.2)
Surgical intervention 65 7.9 76 4.5
Reason for surgery
 Medically necessary interventions during the study period 13 (1.6) NA (NA)
Patient request 5 (0.6) NA (NA)
Treatment of bleeding during study NA (NA) 6 (0.3)
Incomplete expulsion at study end 39 (4.7) 48 (2.9)
Ongoing pregnancy at study end 8 (1.0) 22 (1.3)
Total 827 100 1681 100
 Note: Mifepristone 600 mg oral was administered on Day 1, misoprostol400 µg oral was given on Day 3 (second visit).
INDICATION AND USAGE
Mifeprex is indicated for the medical termination of intrauterine pregnancy through 49 days' pregnancy. For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period in a presumed 28 day cycle with ovulation occurring at mid-cycle. The duration of pregnancy may be determined from menstrual history and by clinical examination. Ultrasonographic scan should be used if the duration of pregnancy is uncertain, or if ectopic pregnancy is suspected.
Any intrauterine device ("IUD") should be removed before treatment with Mifeprex begins.
Patients taking Mifeprex must take 400 µg of misoprostol two days after taking mifepristone unless a complete abortion has already been confirmed before that time (see DOSAGE AND ADMINISTRATION).
Pregnancy termination by surgery is recommended in cases when Mifeprex and misoprostol fail to cause termination of intrauterine pregnancy (see PRECAUTIONS).
CONTRAINDICATIONS
Administration of Mifeprex and misoprostol for the termination of pregnancy (the "treatment procedure") is contraindicated in patients with any one of the following conditions:
 — Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass (the treatment procedure will not be effective to terminate an ectopic pregnancy); — IUD in place (see INDICATION AND USAGE); — Chronic adrenal failure; — Concurrent long-term corticosteroid therapy; — History of allergy to mifepristone, misoprostol or other prostaglandin; — Hemorrhagic disorders or concurrent anticoagulant therapy; — Inherited porphyrias.
Because it is important to have access to appropriate medical care if an emergency develops, the treatment procedure is contraindicated if a patient does not have adequate access to medical facilities equipped to provide emergency treatment of incomplete abortion, blood transfusions, and emergency resuscitation during the period from the first visit until discharged by the administering physician.
Mifeprex also should not be used by any patient who may be unable to understand the effects of the treatment procedure or to comply with its regimen. Patients should be instructed to review the Medication Guide and the PATIENT AGREEMENT provided with Mifeprex carefully and should be given a copy of the product label for their review.
Patients should discuss their understanding of these materials with their health care providers, and retain the Medication Guide for later reference (see PRECAUTIONS).
WARNINGS
(see CONTRAINDICATIONS)
1. Bleeding
Vaginal bleeding occurs in almost all patients during the treatment procedure. According to data from the U.S. and French trials, women should expect to experience bleeding or spotting for an average of nine to 16 days, while up to 8% of all subjects may experience some type of bleeding for 30 days or more. Bleeding was reported to last for 69 days in one patient in the French trials. In general the duration of bleeding and spotting increased as the duration of the pregnancy increased.
In some cases, excessive bleeding may require treatment by vasoconstrictor drugs, curettage, administration of saline infusions, and/or blood transfusions. In the U.S. trials, 4.8% of subjects received administration of uterotonic medications and nine women (1.0%) received intravenous fluids. Vasoconstrictor drugs were used in 4.3% of all subjects in the French trials, and in 5.5% of women there was a decrease in hemoglobin of more than 2 g/dL. Blood transfusions were administered in one of 859 subjects in the U.S. trials and in two of 1800 subjects in the French trials. Since heavy bleeding requiring curettage occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.
2. Confirmation of Pregnancy Termination
Patients should be scheduled for and return for a follow-up visit at approximately 14 days after administration of mifepristone to confirm that the pregnancy is completely terminated and to assess the degree of bleeding. Vaginal bleeding is not evidence of the termination of pregnancy. Termination can be confirmed by clinical examination or ultrasonographic scan. Lack of bleeding following treatment, however, usually indicates failure. Medical abortion failures should be managed with surgical termination.
PRECAUTIONS
General
Mifeprex is available only in single dose packaging. Administration must be under the supervision of a qualified physician (see DOSAGE AND ADMINISTRATION).
The use of Mifeprex is assumed to require the same preventive measures as those taken prior to and during surgical abortion to prevent rhesus immunization.
There are no data on the safety and efficacy of mifepristone in women with chronic medical conditions such as cardiovascular, hypertensive, hepatic, respiratory or renal disease; insulin-dependent diabetes mellitus; severe anemia or heavy smoking. Women who are more than 35 years of age and who also smoke 10 or more cigarettes per day should be treated with caution because such patients were generally excluded from clinical trials of mifepristone.
Although there is no clinical evidence, the effectiveness of Mifeprex may be lower if misoprostol is administered more than two days after mifepristone administration.
Information for Patients
Patients should be fully advised of the treatment procedure and its effects. Patients should be given a copy of the Medication Guide and the PATIENT AGREEMENT. (Additional copies of the Medication Guide and the PATIENT AGREEMENT are available by contacting Danco Laboratories at 1-877-4 Early Option) (1-877-432-7596). Patients should be advised to review both the Medication Guide and the PATIENT AGREEMENT, and should be given the opportunity to discuss them and obtain answers to any questions they may have. Each patient must understand:
 — the necessity of completing the treatment schedule, including a follow-up visit approximately 14 days after taking Mifeprex; — that vaginal bleeding and uterine cramping probably will occur; — that prolonged or heavy vaginal bleeding is not proof of a complete expulsion; — that if the treatment fails, there is a risk of fetal malformation; — that medical abortion treatment failures are managed by surgical termination; and — the steps to take in an emergency situation, including precise instructions and a telephone number that she can call if she has any problems or concerns.
Another pregnancy can occur following termination of pregnancy and before resumption of normal menses. Contraception can be initiated as soon as the termination of the pregnancy has been confirmed, or before the woman resumes sexual intercourse.
Patient information is included with each package of Mifeprex (see Medication Guide).
Laboratory Tests
Clinical examination is necessary to confirm the complete termination of pregnancy after the treatment procedure. Changes in quantitative human Chorionic Gonadotropin (hCG) levels will not be decisive until at least 10 days after the administration of Mifeprex. A continuing pregnancy can be confirmed by ultrasonographic scan.
The existence of debris in the uterus following the treatment procedure will not necessarily require surgery for its removal.
Decreases in hemoglobin concentration, hematocrit and red blood cell count occur in some women who bleed heavily. Hemoglobin decreases of more than 2 g/dL occurred in 5.5% of subjects during the French clinical trials of mifepristone and misoprostol.
Clinically significant changes in serum enzyme (serum glutamic oxaloacetic transaminase (SGOT), serum glutamic pyruvic transaminase (SGPT), alkaline phosphatase, gamma-glutamyltransferase (GT)) activities were rarely reported.
Drug Interactions
Although specific drug-or food interactions with mifepristone have not been studied, on the basis of this drug's metabolism by CYP 3A4, it is possible that ketoconazole, itraconazole, erythromycin, and grapefruit juice may inhibit its metabolism (increasing serum levels of mifepristone). Furthermore, rifampin, dexamethasone, St. John's Wort, and certain anticonvulsants (phenytoin, phenobarbital, carbamazepine) may induce mifepristone metabolism (lowering serum levels of mifepristone).
Based on in vitro inhibition information, coadministration of mifepristone may lead to an increase in serum levels of drugs that are CYP 3A4 substrates. Due to the slow elimination of mifepristone from the body, such interaction may be observed for a prolonged period after its administration. Therefore, caution should be exercised when mifepristone is administered with drugs that are CYP 3A4 substrates and have narrow therapeutic range, including some agents used during general anesthesia.
Carcinogenesis, Mutagenesis, Impairment of Fertility
No long-term studies to evaluate the carcinogenic potential of mifepristone have been performed. Results from studies conducted invitro and in animals have revealed no genotoxic potential for mifepristone. Among the tests carried out were: Ames test with and without metabolic activation; gene conversion test in Saccharomycescerevisiae D4 cells; forward mutation in Schizosaccharomyces pompe P1 cells; induction of unscheduled DNA synthesis in cultured HeLa cells; induction of chromosome aberrations in CHO cells; in vitro test for gene mutation in V79 Chinese hamster lung cells; and micronucleus test in mice.
The pharmacological activity of mifepristone disrupts the estrus cycle of animals, precluding studies designed to assess effects on fertility during drug administration. Three studies have been performed in rats to determine whether there were residual effects on reproductive function after termination of the drug exposure.
In rats, administration of the lowest oral dose of 0.3 mg/kg/day caused severe disruption of the estrus cycles for the three weeks of the treatment period. Following resumption of the estrus cycle, animals were mated and no effect on reproductive performance was observed. In a neonatal exposure study in rats, the administration of a subcutaneous dose of mifepristone up to 100 mg/kg on the first day after birth had no adverse effect on future reproductive function in males or females. The onset of puberty was observed to be slightly premature in female rats neonatally exposed to mifepristone. In a separate study in rats, oviduct and ovary malformations in female rats, delayed male puberty, deficient male sexual behavior, reduced testicular size, and lowered ejaculation frequency were noted after exposure to mifepristone (1 mg every other day) as neonates.
Pregnancy
Mifepristone is indicated for use in the termination of pregnancy (through 49 days' pregnancy) and has no other approved indication for use during pregnancy.
Teratogenic Effects
Human Data
Over 620,000 women in Europe have taken mifepristone in combination with a prostaglandin to terminate pregnancy. Among these 620,000 women, about 415,000 have received mifepristone together with misoprostol. As of May 2000 a total of 82 cases have been reported in which women with on-going pregnancies after using mifepristone alone or mifepristone followed by misoprostol declined to have a surgical procedure at that time. These cases are summarized in Table 2.
 Table 2
Reported Cases (as of May 2000) of On-going Pregnancies Not Terminated bySurgical
 Abortion at the End of Treatment with Mifepristone Alone or with Mifepristone-Misoprostol Mifepristone Mifepristone- Total Alone Misoprostol
Subsequently had surgical abortion 3 7 10 No abnormalities detected 2 7 9 Abnormalities detected 1 0 1 (sirenomelia, cleft palate)
Subsequently resulted in live birth 13 13 26 No abnormalities detected at birth 13 13 26 Abnormalities detected at birth 0 0 0
Other/Unknown 26 20 46
Total 42 40 82
Several reports in the literature indicate that prostaglandins, including misoprostol, may have teratogenic effects in human beings. Skull defects, cranial nerve palsies, delayed growth and psychomotor development, facial malformation and limb defects have all been reported after exposure during the first trimester.
Animal Data
Teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than 1/100 to approximately 1/3 the human exposure level based on body surface area) were carried out. Because of the antiprogestational activity of mifepristone, fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at approximately 1/6 the human exposure, although no teratogenic effects of mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from decreased progesterone levels.
Nonteratogenic Effects
The indication for use of Mifeprex in conjunction with misoprostol is for the termination of pregnancy through 49 days' duration of pregnancy (as dated from the first day of the last menstrual period). These drugs together disrupt pregnancy by causing decidual necrosis, myometrial contractions and cervical softening, leading to the expulsion of the products of conception.
Nursing Mothers
It is not known whether mifepristone is excreted in human milk. Many hormones with a similar chemical structure, however, are excreted in breast milk. Since the effects of mifepristone on infants are unknown, breast-feeding women should consult with their health care provider to decide if they should discard their breast milk for a few days following administration of the medications.
Pediatric Use
Safety and effectiveness in pediatric patients have not been established.
ADVERSE REACTIONS
The treatment procedure is designed to induce the vaginal bleeding and uterine cramping necessary to produce an abortion. Nearly all of the women who receive Mifeprex and misoprostol will report adverse reactions, and many can be expected to report more than one such reaction. About 90% of patients report adverse reactions following administration of misoprostol on day three of the treatment procedure. Those adverse events that occurred with a frequency greater than 1% in the U.S. and French trials are shown in Table 3.
Bleeding and cramping are expected consequences of the action of Mifeprex as used in the treatment procedure. Following administration of mifepristone and misoprostol in the French clinical studies, 80 to 90% of women reported bleeding more heavily than they do during a heavy menstrual period (see WARNINGS, Bleeding for additional information). Women also typically experience abdominal pain, including uterine cramping. Other commonly reported side effects were nausea, vomiting and diarrhea. Pelvic pain, fainting, headache, dizziness, and asthenia occurred rarely. Some adverse reactions reported during the four hours following administration of misoprostol were judged by women as being more severe than others: the percentage of women who considered any particular adverse event as severe ranged from 2 to 35% in the U.S. and French trials. After the third day of the treatment procedure, the number of reports of adverse reactions declined progressively in the French trials, so that by day 14, reports were rare except for reports of bleeding and spotting.
 Table 3 Type of Reported Adverse Events Following Administration ofMifepristone and Misoprostol in the U.S. and French Trials* (percentages) U.S. Trials French Trials
 Abdominal Pain (cramping) 96 NA Uterine cramping NA 83 Nausea 61 43 Headache 31 2 Vomiting 26 18 Diarrhea 20 12 Dizziness 12 1 Fatigue 10 NA Back pain 9 NA Uterine hemorrhage 5 NA Fever 4 NA Viral infections 4 NA Vaginitis 3 NA Rigors (chills/shaking) 3 NA Dyspepsia 3 NA Insomnia 3 NA Asthenia 2 1 Leg pain 2 NA Anxiety 2 NA Anemia 2 NA Leukorrhea 2 NA Sinusitis 2 NA Syncope 1 NA Decrease in hemoglobin greater than 2 g/dL NA 6 Pelvic pain NA 2 Fainting NA 2
* Only adverse reactions with incidence 1% are included.
OVERDOSAGE
No serious adverse reactions were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than threefold that recommended for termination of pregnancy. If a patient ingests a massive overdose, she should be observed closely for signs of adrenal failure.
The oral acute lethal dose of mifepristone in the mouse, rat and dog is greater than 1000 mg/kg (about 100 times the human dose recommended for termination of pregnancy).
DOSAGE AND ADMINISTRATION
Treatment with Mifeprex and misoprostol for the termination of pregnancy requires three office visits by the patient. Mifeprex should be prescribed only by physicians who have read and understood the prescribing information. Mifeprex may be administered only in a clinic, medical office, or hospital, by or under the supervision of a physician, able to assess the gestational age of an embryo and to diagnose ectopic pregnancies. Physicians must also be able to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.
Day One: Mifeprex Administration
Patients must read the Medication Guide and read and sign the PATIENT AGREEMENT before Mifeprex is administered.
Three 200 mg tablets (600 mg) of Mifeprex are taken in a single oral dose.
Day Three: Misoprostol Administration
The patient returns to the healthcare provider two days after ingesting Mifeprex. Unless abortion has occurred and has been confirmed by clinical examination or ultrasonographic scan, the patient takes two 200 µg tablets (400 µg) of misoprostol orally.
During the period immediately following the administration of misoprostol, the patient may need medication for cramps or gastrointestinal symptoms (see ADVERSE REACTIONS). The patient should be given instructions on what to do if significant discomfort, excessive bleeding or other adverse reactions occur and should be given a phone number to call if she has questions following the administration of the misoprostol. In addition, the name and phone number of the physician who will be handling emergencies should be provided to the patient.
Day 14: Post-Treatment Examination
Patients will return for a follow-up visit approximately 14 days after the administration of Mifeprex. This visit is very important to confirm by clinical examination or ultrasonographic scan that a complete termination of pregnancy has occurred.
According to data from the U.S. and French studies, women should expect to experience bleeding or spotting for an average of nine to 16 days. Up to 8% of women may experience some type of bleeding for more than 30 days. Persistence of heavy or moderate vaginal bleeding at this visit, however, could indicate an incomplete abortion.
Patients who have an ongoing pregnancy at this visit have a risk of fetal malformation resulting from the treatment. Surgical termination is recommended to manage medical abortion treatment failures (see PRECAUTIONS, Pregnancy).
Adverse events, such as hospitalization, blood transfusion, ongoing pregnancy, or other major complications following the use of Mifeprex and misoprostol must be reported to Danco Laboratories. Please provide a brief clinical and administrative synopsis of any such adverse events in writing to:
Medical Director Danco Laboratories, LLC P.O. Box 4816 New York, N Y 10185 1-877-4-Early Option (1-877-432-7596)
For immediate consultation 24 hours a day, 7 days a week with an expert in mifepristone, call Danco Laboratories at 1-877-4 Early Option (1-877-432-7596).
HOW SUPPLIED
Mifeprex will be supplied only to licensed physicians who sign and return a Prescriber's Agreement. Distribution of Mifeprex will be subject to specific requirements imposed by the distributor, including procedures for storage, dosage tracking, damaged product returns and other matters. Mifeprex is a prescription drug, although it will not be available to the public through licensed pharmacies.
Mifeprex is supplied as light yellow, cylindrical, bi-convex tablets imprinted on one side with "MF." Each tablet contains 200 mg of mifepristone. Tablets are packaged in single dose blister packets containing three tablets and are supplied in individual cartons (National Drug Code 6487500103).
Store at 25 °C (77 °F); excursions permitted to 15-30 °C (59-86 °F) (see USP Controlled Room Temperature].
Manufactured for:
Danco Laboratories, LLC P.O. Box 4816 New York, N Y 10185 1-877-4 Early Option (1-877-432-7596)www.earlyoptionpill.com
 MIFEPREXTM
(Mifepristone) Tablets, 200 mg PRESCRIBER'S AGREEMENT
We are pleased that you wish to become a provider of Mifeprex (Mifepristone) Tablets, 200 mg, which is indicated for the medical termination of intrauterine pregnancy through 49 days from the first day of the patient's last menstrual period (see full prescribing Information). Prescribing Information, Mifeprex Medication Guides and PATIENT AGREEMENT forms will be provided together with your order of Mifeprex.
Prior to establishing your account and receiving your first order, you must sign and return this letter to the distributor, indicating that you have met the qualifications outlined below and will observe the guidelines outlined below. If you oversee more than one office facility, you will need to list each facility on your order form prior to shipping the first order.
By signing the reverse side, you acknowledge receipt of the PRESCRIBER'S AGREEMENT and agree that you meet these qualifications and that you will follow these guidelines for use. You also understand that if you do not follow these guidelines, the distributor may discontinue distribution of the drug to you.
Under Federal law, Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications:
 • Ability to assess the duration of pregnancy accurately.
 • Ability to diagnose ectopic pregnancies.
 • Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.
 • Has read and understood the prescribing information of Mifeprex. The prescribing information is attached to this letter, and is also available by calling our toll free number, 1-877-4 Early Option (1-877-432-7596), or logging on to our website, www.earlyoptionpill.com.
In addition to these qualifications, you must provide Mifeprex in a manner consistent with the following guidelines.
 • Under Federal law, each patient must be provided with a Medication Guide. You must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and PATIENT AGREEMENT, give her an opportunity to read and discuss them, obtain her signature on the PATIENT AGREEMENT, and sign it yourself.
 • The patient's follow-up visit at approximately 14 days is very important to confirm that a complete termination of pregnancy has occurred and that there have been no complications. You must notify Danco Laboratories in writing as discussed in the Package Insert under the heading DOSAGE AND ADMINISTRATION in the event of an on-going pregnancy which is not terminated subsequent to the conclusion of the treatment procedure.
 • While serious adverse events associated with the use of Mifeprex are rare, you must report any hospitalization, transfusion or other serious event to Danco Laboratories, identifying the patient solely by package serial number to ensure patient confidentiality.
 • Each package of Mifeprex has a serial number. As part of maintaining complete records for each patient, you must record this serial number in each patient's record.
Danco Laboratories, LLC P.O. Box 4816 New York. N Y 10185 1-877-4 Early Option (1-877-432-7596) www.earlyoptionpill.com
 PATIENT AGREEMENT
Mifeprex (mifepristone) Tablets
1. I have read the attached Medication Guide for using Mifeprex and misoprostol to end my pregnancy.
2. I discussed the information with my health care provider (provider).
3. My provider answered all my questions and told me about the risks and benefits of using Mifeprex and misoprostol to end my pregnancy.
4. I believe I am no more than 49 days (7 weeks) pregnant.
5. I understand that I will take Mifeprex in my provider's office.
6. I understand that I will take misoprostol in my provider's office two days after I take Mifeprex (Day 3).
7. My provider gave me advice on what to do if I develop heavy bleeding or need emergency care due to the treatment.
8. Bleeding and cramping do not mean that my pregnancy has ended. Therefore, I must return to my provider's office in about 2 weeks (about Day 14) after I take Mifeprex to be sure that my pregnancy has ended and that I am well.
9. I know that, in some cases, the treatment will not work. This happens in about 5 to 8 women out of 100 who use this treatment.
10. I understand that if my pregnancy continues after any part of the treatment, there is a chance that there may be birth defects. If my pregnancy continues after treatment with Mifeprex and misoprostol, I will talk with my provider about my choices, which may include a surgical procedure to end my pregnancy.
11. I understand that if the medicines I take do not end my pregnancy and I decide to have a surgical procedure to end my pregnancy, or if I need a surgical procedure to stop bleeding, my provider will do the procedure or refer me to another provider who will. I have the provider's name, address and phone number.
12. I have my provider's name, address and phone number and know that I can call if I have any questions or concerns.
13. I have decided to take Mifeprex and misoprostol to end my pregnancy and will follow my provider's advice about when to take each drug and what to do in an emergency.
14. I will do the following: — return to my provider's office in 2 days (Day 3) to check if my pregnancy has ended. My provider will give me misoprostol if I am still pregnant. — return to my provider's office about 14 days after beginning treatment to be sure that my pregnancy has ended and that I am well
Patient Signature: _________________________________________
Patient Name (print): ______________________________________
Date: ______________________________________________________
The patient signed the PATIENT AGREEMENT in my presence after I counseled her and answered all her questions. I have given her the Medication Guide for mifepristone.
Provider's Signature: ______________________________________
Name of Provider print: ____________________________________
Date: ______________________________________________________
After the patient and the provider sign this PATIENT AGREEMENT, give I copy to the patient before she leaves the office and put I copy in her medical record. Give a copy of the Medication Guide to the patient.
9/21/00